# UNITED STATES DISTRICT COURT
for the
Southern District of Ohio

| | |
|---|---|
| United States of America<br>v.<br><br>Matthew L. Dailey<br>*Defendant(s)* | ) ) ) ) ) ) ) )<br>Case No. 2:15-mj-607 |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of 09/18/2015 in the county of Knox and Franklin in the Southern District of Ohio, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. 1951 | Extortion Under Color of Official Right |
| 21 U.S.C. 846 | Conspiracy to Possess with Intent to Distribute Oxycodone, a Schedule II Controlled Substance |
| 18 U.S.C. 924c | Possession of a Firearm in Furtherance of a Qualifying Felony |

This criminal complaint is based on these facts:
See attached Affidavit

☒ Continued on the attached sheet.

*Complainant's signature*

Tisha Hartsough, FBI
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 9/28/2015

*Judge's signature*

City and state: Columbus, Ohio       Terrence P. Kemp, U.S. Magistrate Judge
*Printed name and title*

AFFIDAVIT IN SUPPORT OF ARREST OF
MATTHEW L. DAILEY

Based upon my training, experience and my review of the evidence gathered by agents and narcotics detectives assigned to this investigation, there is probable cause to believe that **Matthew L. Dailey** has violated 18 U.S.C. 1951, Extortion Under the Color of Official Right; and 21 U.S.C. 846, Conspiracy to Possess with Intent to Distribute a Controlled Substance (Oxycodone), a Schedule II Controlled Substance. *and possession of a firearm in violation of 18 USC 924(c)(1).* This affidavit does not contain each and every fact known to me about this investigation, only those necessary to establish probable cause in support of a request for the issuance of a Federal Complaint and Arrest warrant for **Matthew L. Dailey.**

During September 2015, the Columbus Office of the Federal Bureau of Investigation (FBI) Public Corruption Task Force received information from an individual alleging that Matt Dailey, an officer with the Mt. Vernon Police Department (MVPD), was corrupt and was presently using his official position to engage in illegal activity, namely narcotics trafficking. The complainant, hereinafter referred to as CI1, provided the following information regarding MVPD Officer Matt Dailey. CI1 has proven truthful and reliable in that his/her information was either previously known by or has been able to be corroborated by law enforcement. Specifically, CI1 said that on approximately four recent occasions, Dailey obtained narcotics, possibly including from the police property room, and requested CI1 sell the drugs. CI1 said Dailey provided him with quantities of marijuana, methamphetamine and ecstasy pills in quantities large enough for distribution. CI1 reported that he returned the proceeds from the sales of those drugs directly to Dailey.

CI1 said on or about September 5, 2015, he was approached by Dailey who proposed CI1 sell drugs provided to him by Dailey and split the profits. Dailey told CI1 he was tired of being out on the street and seeing 'people make bank on this'. CI1 said he initially agreed to do this with Dailey because the two had developed a relationship over the years since their first meeting approximately seven years ago when CI1 had been arrested for drug possession and worked off the charges as Dailey's informant. CI1 said he was afraid and skeptical of Dailey's motives when Dailey proposed the idea to him since it was highly irregular for a police officer to offer to sell drugs outside the scope of his official duties. At some point, Dailey told CI1 he was selling drugs to help out his cousin who was a drug dealer himself who owed money to his drug suppler. CI1 said he felt as if he could not say no to Dailey because Dailey was an authority figure. Dailey had helped CI1 by paying CI1 for drug information when CI1 fell on hard financial times over the course of their relationship. CI1 said he felt he owed it to Dailey to do this for him.

During their first meeting, Dailey produced 1/4 pound of marijuana wrapped in a wet t-shirt and told the CI1 to sell it and they could split the money. Because of CI1's concerns about Dailey's motives, CI1 decided to pay for the 1/4 pound of marijuana out of his own money and used an application he downloaded onto his phone to record himself going to his bank to withdraw $400.00 for the marijuana. CI1 met Dailey and gave him the $400. Dailey gave CI1 $100 back. Because of his concerns, CI1 maintained the t-shirt that contained the marijuana. CI1 turned that t-shirt over to agents.

A few days later, Dailey called CI1 and said to meet him at the Tractor Supply Company. Once there, Dailey told CI1 to get into his vehicle. CI1 believed Dailey was driving a work vehicle that day because there was a police radio in it. Dailey drove CI1 to an old barn in a field out in the country. Dailey drove behind the barn, out of the view of the roadway, into a field with high weeds. Dailey told CI1 to get out of the vehicle. Dailey began patting CI1 down. CI1 thought Dailey was about to arrest him and felt foolish that he had been set up by Dailey. CI1 put his arms up as if he was submitting to an arrest and Dailey said, 'put your arms down, it's not like that'. CI1 then realized Dailey was checking CI1 for a wire. Dailey took CI1's phone, which had the recording app running, and tossed it into the car

1

and closed the door. The two men stood outside of the car. Dailey gave CI1 another 1/4 pound of marijuana and 1/2 pound of marijuana trimmings for CI1 to sell. Dailey asked CI1 if he could sell methamphetamine, crystal meth chards, more marijuana and Suboxone. Dailey told CI1 they would not be able to talk freely on the phone and told CI1 they should use 'camo hat' to mean marijuana and 'regular hat' to mean methamphetamine in their telephone communications. CI provided agents access to his phone and the text messages to and from the known MVPD issued telephone number assigned to Dailey. The text messages used this coded language. CI1 was unable to sell the marijuana trimmings and provided those to agents.

When Dailey took CI1 out to the barn, CI1 noticed a Kimber handgun in plain view on Dailey's hip. While this was the only time CI1 saw Dailey's handgun in plain view, he always assumed Dailey had a weapon on him because he was a police officer. When CI1 saw the gun on Dailey's hip that night, he wasn't immediately alarmed. However, when Dailey told CI1 to get out of the vehicle and began to pat him down, CI1 said he began to feel very anxious. CI1 said he begin thinking about how Dailey was a police officer who had gone bad and how Dailey was now searching him while wearing a pistol on his hip. CI1 told Dailey he was very nervous. Dailey replied that he was nervous too. Dailey said he had never done anything like this before. He told CI1 that he just wanted to help his cousin so he didn't end up, and he pointed to the barn near them, under one of those. CI1 said his immediate thought was that it was he, the CI1, who would be ending up buried under a barn by Dailey.

Before CI1 had an opportunity to collect the money for the 1/4 pound of marijuana, Dailey called CI1 to say he had 30 grams of methamphetamine for CI1 to sell. Dailey told CI1 to go to the barn where Dailey had taken CI1 and look behind a specific plank in the wall. Dailey told CI1 there would be black gloves wrapped around the drugs and the packaging and that CI1 should use those gloves to take the outer wrappings off the drugs and discard them in the barn. The drugs were found by CI1 exactly where and how Dailey described. The drugs were contained within what appeared to be a heat sealed bag with a handwritten number and handwritten initials on it. CI1 thought this was likely an evidence bag, so he did not discard it as Dailey instructed. CI1 took the 30 grams to a local drug dealer who determined 17 grams of the substance were actually bath salts and the remaining 13 grams were methamphetamine. CI1 was paid $500 for it which he gave to Dailey at an elementary school. The baggie that appeared to be an evidence bag, along with the black gloves, were turned over to agents by CI1.

On or about September 16, 2015, CI1 met with Dailey. Dailey gave CI1 one gram of methamphetamine, 18 ecstasy pills and 1/4 pound of marijuana to sell. CI1 sold the meth for $70. Dailey was expecting half of that money. Dailey was expecting $10 per ecstasy pill, therefore $180.00, minus a cut for CI1. CI1 gave a drug dealer he knows 5 of the pills and kept 13 in his possession. CI1 also gave a drug dealer the entire 1/4 pound of marijuana for which he expected to receive $400. CI1 assumed Dailey would give him $100 cut from that. On September 18, 2015, sometime in the early hours of the day, Dailey texted CI1, 'what's up homey'. CI1 took that to mean Dailey wanted to know the status of the sale of the drugs. Intervening events took place and on that day, September 18, 2015, Dailey was placed on administrative leave from MVPD and has not since contacted CI1. Therefore, CI1 has not paid Dailey for these drug sales. CI1 provided the thirteen ecstasy pills he maintained to agents.

Dailey would meet CI1 both on duty and off duty. Dailey never stayed where he told CI1 to meet him. He told CI1 he moved to different locations because he knows how 'his boys' work and he didn't want them to see him with CI1. Dailey told CI1 not to drive with drugs in the car during third shift because third shift had the best narcotics guys working. He told CI1 if CI1 was stopped, not to talk to the police and to let the officer know CI1 worked for Dailey so that he would be let go. Dailey also told CI1 that if he ever called CI1 when CI1 was at a drug dealer's house and told him it was time to go, that would mean Dailey had just received information the house was about to be raided.

2

Dailey told CI1 that he did not need to worry about being caught because all active drug investigations were run through him. He said he was in charge at the Police Department of these investigations and there was an unofficial agreement whereby the Knox County Sheriff's Office would run their investigations by Dailey. CI1 told agents he felt there was a bartering arrangement between him and Dailey; that if CI1 dealt Dailey's drugs, Dailey would protect CI1. CI1 told agents something bad would have happened to him if he would have tried to stop dealing drugs with Dailey. CI1 said he felt as if Dailey would either kill him or use the information CI1 has given Dailey against him. Specifically, the CHS said he was worried Dailey could go to the people who CI1 gave Dailey's drugs to sell and tell them that CI1 had given them up, then tell those dealers they would be in trouble if they didn't work against CI1.

CI1 was asked if he was ever asked to sign any receipts or any other paperwork which would document the transactions with Dailey and CI1 responded he has not signed or been given any paperwork of any type for these transactions. The CHS was never asked by Dailey to wear a wire during any of the drug transactions he did for Dailey. In fact, Dailey specifically told the CHS he did not want the CHS to do any normal informant work, because Dailey he was not looking to make arrests. The CHS took that to mean what Dailey was asking him to do was solely to conduct drug business.

CI1 provided agents access to the recordings he made on his cell phone. There were seven recordings made. Four of them were audio memorandums CI1 made to serve as a log of events that took place with Dailey. Three of them contained audio of meetings between CI1 and Dailey. The recordings are corroborative of the details provided by CI1. Additionally, the recordings revealed conversations between Dailey and CI1 such as the following, in part:

*Dailey: The one thing I learned from you guys, is you don't keep all your eggs in one fucking spot.*

*CI1: Damn straight.*

*Dailey: That's one thing I did learn in this game, doing this shit with you guys is, nobody keeps, smart ones, don't keep their stuff in their fucking house.*

Another:

*Dailey: Each time I'll go to a different spot.*

*CI1: Okay.*

*Dailey: I've paid attention to how you guys have done it.*

And another:

*CI1: I honestly don't know how much this is going to bring back.*

*Dailey: Get what you can.*

*CI1: I'll let you know, in a secret way. This will bring back the same.*

*Dailey: Ok.*

3

CI1:    *This is good.*

Dailey: *Well, if somebody say, you know, hey I'll give you, fucking, whatever for that, just take it. Because there is two more to get rid of too.*

CI1:    *Ok.*

Dailey can be heard in portions of these recordings giving details about his alleged cousin. Dailey told the CHS that the source of supply for the drugs he was bringing to the CHS was a black guy from Michigan who his cousin hooked him up with. He said the source of supply was currently operating in Columbus. Dailey also told the CHS that he had an arrangement with his cousin that his cousin would not bring drugs into Mt. Vernon. Significant portions of those recordings are as follows, in part;

Dailey: *You know anybody that can get rid of subs?*

CI1:    *Suboxones?*

Dailey: *Suboxones.*

(Intervening conversation omitted for purposes of brevity and protection of other individuals)

MD:     *My cousin can get unlimited.*

CI1:    *Damn, for real?*

MD:     *Yeah, for real.*

CI1:    *Ok.*

MD:     *My cousin is hooked in, like, up north. There is a reason, like sometimes I've gotten some of my big arrests and how I know some of the people I know.*

CI1:    *Understood.*

MD:     *My cousin has called and brought names to me.*

CI1:    *Right.*

MD:     *So be it if it's the competition.*

(Intervening conversation omitted for purposes of brevity and protection of other individuals)

Dailey: *Well, I guess, my thought behind it was if it helps you out, maybe I can introduce you to my cousin down the road. Kind of, do my part to get him out of trouble and once he's cool, introduce you guys, then I can get the fuck out of it. You know what I'm saying?*

During this same time period the Drug Enforcement Administration (DEA) in Columbus interviewed Confidential Informant #2 (hereinafter referred to as CI2), whom they had observed meet with Dailey on multiple occasions at locations in Columbus, regarding his/her knowledge of Dailey. CI2 has proven truthful and reliable in that his/her information was previously known or has been able to be corroborated by law enforcement.

4

      CI2 told agents he had sold Dailey approximately 30-50 Oxycodone pills 5-6 days a week for the past seven to eight months. The majority of the pills were 30mg but some were smaller dosages. CI2 said Dailey travelled to Columbus from approximately one hour away and pay cash up front for the pills, usually totaling $700- $800 each day. Dailey called or sent a text message to CI2 to place an order and would most often pick up the order in the morning hours. Approximately once a week, Dailey traveled to Columbus, OH twice per day to purchase similar quantities of Oxycodone from CI2. **NOTE:** A *conservative* estimate of the total amount of Oxycodone pills purchased and money spent by Dailey from CI2 is 6000 (This estimate uses the lower end of pills purchased per day (30), at $1 per milligram, for 25 days per month, which is consistent with CI2's actual quantities and amount expended is likely much greater).

| Month | x days | x No. of pills | = total pills /month | amt spent/ month |
|---|---|---|---|---|
| 1 | 25 | 30 | 750 | (750 x 25) = 18,750 |
| 2 | 25 | 30 | 750 | (750 x 25) = 18,750 |
| 3 | 25 | 30 | 750 | (750 x 25) = 18,750 |
| 4 | 25 | 30 | 750 | (750 x 25) = 18,750 |
| 5 | 25 | 30 | 750 | (750 x 25) = 18,750 |
| 6 | 25 | 30 | 750 | (750 x 25) = 18,750 |
| 7 | 25 | 30 | 750 | (750 x 25) = 18,750 |
| 8 | 25 | 30 | 750 | (750 x 25) = 18,750 |
| **Totals** | | | 6000 | $ 150,000 |

      CI2 was introduced to Dailey through associates who were pill users and who had sold Dailey pills themselves for approximately one year prior to introducing Dailey to CI2. CI2 knew Dailey as "Matt". Dailey told CI2 he worked installing security systems. At their first meeting seven to eight months ago, CI2 questioned if Dailey was a police officer. Dailey said he wasn't and CI2 told him to prove it by ingesting 8 Oxycodone pills that were lying on the table. Dailey swallowed the pills and appeared unaffected by them. CI2 then agreed to sell him pills. Shortly thereafter, Dailey got into his vehicle and departed.

      CI2 described to agents that Dailey was in possession of a handgun during their previous drug deals. The gun was a silver .45 caliber with a black handle that Dailey kept between his car seat and center console. CI2 has observed Dailey with this gun in a vehicle matching the description of his official unmarked police vehicle. CI2 described a dark Chevrolet pickup truck and a blue Nissan SUV as vehicles Dailey drove when conducting his drug purchases. Your affiant knows a dark blue Chevrolet Silverado pickup truck is registered to Dailey and Dailey drives a blue Nissan Pathfinder SUV as his official duty vehicle with MVPD.

      According to CI2, about two weeks ago, Dailey tried to sell CI2 approximately one ounce of methamphetamine and approximately one half pound of marijuana. When CI2 would not buy the drugs, Dailey asked him if he could recommend someone who would. CI2 told Dailey he did not know anyone who would. CI2 told agents the marijuana was compressed and contained within a 'funny looking' plastic bag with a 1/2 inch wide white strip across the front. The bag was not sealed and it was not a ziplock. The methamphetamine was packaged in a regular ziplock baggie. Just days before, Dailey had tried to sell CI2 approximately one ounce of cocaine which CI2 did not buy because of the poor quality.

Dailey asked CI2 if he could buy Suboxone from him. Dailey said he had a guy who would sell them. Just prior to DEA approaching CI2, he had ordered up the Suboxone for Dailey. Dailey also asked CI2 if he could get heroin and marijuana for him. Additionally, the two men discussed CI2 getting cocaine for Dailey to sell.

Agents have reviewed phone activity and text messages between Dailey's MVPD issued cellular telephone and CI2's cellular telephone. The recent contact and specific information included in texts between the two further corroborate the information provided by CS2. Further, information provided by CI1 matches CI2's information, thus corroborating both informants, as the two have provided the information completely independent of one another.

Your affiant has determined that Dailey was not operating in his official capacity as a Mt. Vernon Police Officer during any of these transactions with CI2 and was instead illegally purchasing the narcotics from CI2. Your affiant has also determined that Dailey used his official duty vehicle and conducted some of these transactions during his scheduled work hours.

Based on this information, your affiant believes probable cause exists that **Matthew L. Dailey** has violated 18 U.S.C. 1951, Extortion Under the Color of Official Right; and 21 U.S.C. 846, Conspiracy to Possess with Intent to Distribute a Controlled Substance (Oxycodone), a Schedule II Controlled Substance.

Tisha M. Hartsough
Special Agent
Federal Bureau of Investigation


Subscribed and Sworn to before me
This 28th day of September, 2015

Norah McCann King
U.S. Magistrate Judge
Southern District of Ohio

6